Stephanie Ames of hearing for Mr. Manuel Beltran-Higuera, counsel for the co-defendant has graciously allowed me an additional two minutes, so I will be taking up 12 minutes of the court's time. I would ask to reserve four minutes for rebuttal. Okay. You keep track of the time, then. That means as soon as you've used eight, you're down more or less to your target area, okay? Okay. Thank you, Your Honors. If it may so please the court, I would first like to address the issue of the resulting in death enhancement that was applied to Mr. Beltran. 18 United States Code, section 2237 addresses the illegality of a boat captain or an operator who refuses to obey an order by a federal law enforcement officer to heave to that vessel. And it applies an enhanced penalty if that results in a death. There is no requirement for knowledge for that enhancement. And that makes sense for the operator or the driver of the vehicle, because the open waters can be inherently dangerous, and risky behavior on that water could result in serious consequences, including death. So it doesn't matter that the boat operator knows that his actions resulted in someone's death because he should have known that death could be a result from those reckless actions. And I would suggest that that's much like the drug dealer, and the government points to the case of United States v. Houston, that if someone is dealing in dangerous drugs to another, again, it's common sense that the drugs that they're dealing, the user could overdose or it may be a bad drug that kills them. I want to make sure I understand your argument. Your focus and a lot of your focus is on Mr. Beltran. You argued he didn't have knowledge that death of a person might affect his sentence. Is that what you're arguing? What I'm arguing, and I'm not quite answering your question as directly, what I'm trying to argue is that there is no knowledge requirement for the principal actor. And that makes sense for the reasons that I was arguing is the inherent risk, the danger of those actions. However, for an accomplice, an accessory after the fact, that that knowledge requirement should in fact apply. And so you're saying he should be, that your client shouldn't be prosecuted for the accessory after the fact for the failure to heave because the government didn't prove that he had knowledge of the death element. Correct. That your argument is an element, but it's not really an element. It's an enhancement. It seems like it's an enhancement under the statute. But I guess my question is, does it matter in the end because that particular offense, the sentence that he got, was grouped with the assault. It was a lesser offense level and it was grouped with the assault. So does it really affect in any way the sentence if that's what you're arguing on this on behalf or are you just saying he should never have been convicted of that in the first place? Well, I understand the court's point on the grouping. That individual count itself, it does make a big difference and because of that, if you look at it without that enhancement, and if, excuse me, if I just may. I mean, if you look at it without that enhancement, he gets a lesser sentence, but that's not what drove his sentence. It was the assault. Right. We end up only with an offense level for that count of 20, a total offense level of 20. However, I guess I would point out that my argument is also that for the same mens rea issue as it relates to the aggravated assault accessory after the fact charges, those would no longer be in place and so his sentence would be significantly less than what the court gave him. How would it have been significantly less? Part of my argument is that he should not have been convicted of accessory after the fact to any of the aggravated assault charges, including the one for resulting in death. And if I just may finish on that one point, because for the accomplice, like for the drug dealer, you know, anyone who assists the drug dealer, the wife, the girlfriend, the brother, or what have you, to hide at their house afterwards, they shouldn't be held accountable for the death that resulted from the drug dealer. And likewise, for Mr. Beltran, he should not be held accountable for the resulting in death. However, if I then would address the court's questions that goes to the aggravated assault charges, and I apologize, I've lost my notes here for one moment. That's why Defendant Beltran should not be accountable as an accessory after the fact, but only as an accomplice for the second failure to heave. And why the court should read the United States Code Section 18 U.S.C. Subsection 3 to require proof beyond a reasonable doubt that Defendant's mens rea, that's Mr. Beltran's, was the specific purpose or design to hinder or prevent another's apprehension rather than merely being incidental thereto. In this case, Mr. Beltran engaged in joint criminal activity, and that was to drive a Ponga or be a passenger in a Ponga from Mexico up to the United States to engage in the importation of marijuana. As the government notes in its briefing, that driving, having that criminal offense takes two people. One person would not be able, excuse me, to drive the boat up and back all by himself and it would require the assistance of two people. And so Mr. Beltran, when he got on that boat, should be criminally liable for what he intended to do. And all of my arguments on all of these points is that there was a lack of evidence regarding his knowledge and regarding his intent. Once he got on that boat, he's now trapped, quite frankly. And this is a slightly unusual case from others. And that's why I equated it to the getaway car driver for robberies. Because Mr. Beltran, there was nothing about when he got on the boat in Mexico that would have made him aware that this could become a violent situation. No guns. After the Coast Guard was on to these people and the Coast Guard began chasing them after this, the Ponca comes around, hits the Coast Guard Zodiac, kills the man, injures the man, and then they run away. Mr. Beltran is not behaving as if he's someone who's been trapped. He's not regarding the Coast Guard as rescuers. He's helping that boat get away. Yes, he is helping the boat get away. But he's not intending, I would argue, that there was no evidence that he was attempting intending to assist Mr. Mejia-Leva to avoid Mr. Mejia-Leva's capture or prosecution. Mr. Beltran voluntarily participated in the criminal enterprise of importing narcotics into the United States, and he tried to escape from that action. However, he was not an accessory after the fact. This whole thing was one long congruence of actions. And there was, when he got onto the boat, there was no evidence to him that Mr. Mejia-Leva was going to use the boat to ram anyone. But after the ramming took place, it sounds as though he's actively assisting in the attempt to get away. Is that correct? And he's operating these fuel lines. Yes. Looks as though he's assisting. Yes. So that sounds like accessory after the fact to me. I would argue, Your Honors, that this is, again, akin to the bank robbery case, where the person gets in the car. He's the driver. He takes the bank robbers, who may or may not have guns, to the location. He sits in the waiting vehicle, and he assists to leave. In those situations, unless he knows that someone has a gun on them and intends to use that against the individuals in the bank, he's not held criminally culpable as an accomplice after the fact if someone, in fact, did have a gun on them, unbeknownst to him, and shoot someone inside the bank. I would submit that Mr. Beltran is in that same kind of situation. He knowingly engaged in bringing drugs up to the United States, and he's going to have to stay on that boat to get back to complete that criminal activity.  So this is all one long criminal episode, rather than being able to be broken up into different segments. Now, you're down to, having used 10 minutes, and you're trying to use only 12 questions. And I apologize. I will reserve, and I'll submit there for that. Thank you. Morning, Your Honors. Michael Belter for Mr. Mejia-Lewa. Our issue is this. It was the same issue in front of the jury in the district court. Second degree murder or involuntary manslaughter. I'm assuming that the court's seen the videotape and has watched the videotape. Our defense position at the time of trial, and it remains the position, is that Mr. Mejia-Lewa did not intentionally pilot the Ponga with an intent to ram the intercepting Zodiac. There are some facts that were presented during the course of the trial that would suggest that, in fact, he did not deliberately hit the Zodiac midship. He started off straight. He veered port. But there was a number of shots that had been fired. From the heat signatures, as you can see from the C-130 surveillance video, at some point, Mr. Mejia-Lewa is no longer recognized as a heat signature. He's, in essence, been knocked to the floor of the Ponga. The killing of Chief Petty Officer Horn occurs as the two boats, after they've collided, start to rotate off one another. And that's where Chief Petty Officer Horn has been sort of trapped down in between the two vessels. And he's killed by the propellers of Mr. Mejia-Lewa's Ponga. From the video, it would appear that the Ponga, as it disengages and slowly moves counterclockwise away from the Zodiac, it's pilotless, and it starts to basically go adrift northward back towards the island. And from the video, it would appear that the Ponga stays motionless in the water for some amount of time before it re-engages. You can see Mr. Mejia-Lewa's heat signature.  And south towards Mexico. In essence, the difference between second-degree murder and involuntary manslaughter is a question of whether or not Mr. Mejia-Lewa intentionally rammed the boat. The jury, obviously looking at the evidence in the case, decided that he intentionally rammed the boat. The defense, buttressed by not only the physical evidence, but the defense's own navigation reconstruction expert, gave reason to support that that was not an intentional ramming. But we have to view this in the light most favorable. No, I completely appreciate that. And at this point, obviously, there's been a conviction, and Mr. Mejia-Lewa has appealed that conviction. I completely understand the standard of review. Our position today is that the jury just made a mistake. That if you consider all the evidence, and granted you do it in the light favorable to the prosecution, but the reasonable interpretation or reasonable inference from the evidence would be that Mr. Mejia-Lewa did not intentionally ram the Zodiac, that he did not intentionally act in a way to kill an officer, that the death of the officer actually occurs as the two boats, or the two vessels, rather, start to slowly disengage after the collision. There are some additional facts that seem pretty clear from the trial. But if the death of the officer, petty officer, takes place as the boats are separating, that's neither here nor there with the question as to whether he intentionally rammed the Zodiac in the first place. Your Honor, I completely agree. I completely agree. Although, again, the question of the intentional ramming versus, quite frankly, a loss of control, this is all happening within seconds. And as the two boats are rushing towards one another, and the Zodiac is planing, comes off plane, settles, and then moves again forward towards the Ponga. As the Ponga is accelerating, and as the Ponga accelerates at full throttle, the bow goes way up, which causes the pilot to lose some visual sighting of what's directly in front of them. Then shots are fired. And I've already, I guess. No, I understand you've done a good job with the tough case. I did have a question for you about whether there was any argument that counts one and four were multiplicitous. Counts one and four being? The death of Horn and the assault on Horn. Well, those, yes, Your Honor. You can't be punished for both of those. Because he was convicted of both.  And I was kind of curious as to, I mean, I don't, ultimately, I think it probably has no effect whatsoever here. I'm just wondering if there was any argument below as to why count four can stand when he's already been convicted of count one. Your Honor, I don't recall, I was trial counsel for Mr. Mejia-Leva. I don't recall making that argument at sentencing. Our point when we were asking for Rule 29, Rule 33, was for the court to look at the evidence. Mr. Mejia-Leva testified. We had a defense reconstruction expert testify. Obviously, there was significant testimony from the surviving officers, Coast Guard officers, the young men who were on the Zodiac. And we were asking the court to simply do what we're asking of this court again, is to look at this evidence. Obviously, the standard review is pretty clear. But to look at the evidence and come to the conclusion that a reasonable interpretation is that Mr. Mejia-Leva did not intend to ram the boat, that he did not act with implied malice, in essence. The government made much of the intent to avoid apprehension in its argument before the jury and also in its briefing before this court. And I want to just use that for a moment. To avoid apprehension, one would, I think it's reasonable to infer, that you would not intentionally then ram a boat, become lodged on the boat, meaning the Zodiac, and now, in essence, create a roadblock to your own escape route. So to ram the boat is not consistent with an absolute intention to get out to the open water and to outrun, not just the Zodiac, but our understanding from the testimony in the trial is that the Ponga boats, once they get out in the open water, they can actually outrace, not the cutters, but the mid-sized boats. So with that, your honors, thank you very much. OK, thank you. And then you've saved a little time for the rebuttal. Good afternoon. May it please the court, Max Scheiner, appearing for the United States. I'd like to begin with Mr. Belcher's argument, so I'll take the last first. Correct, he's correct. We have to review this in the light most favorable to the prosecution and determine whether any rational jury could find that the defendant acted with malice aforethought, that is, recklessly and with extreme disregard for human life. Correct, you noted, Judge Fletcher, that the government's theory was that the Ponga, that Mr. Mejia driving the Ponga rammed the Coast Guard small boat. So this sets the case quite a bit apart from any of the cases that were cited by the defense regarding involuntary manslaughter. For example, Pineda-Deval, individuals are fleeing from the police, that's correct, but apart from violating traffic laws, there was nothing in their conduct that indicated recklessness that went to such an extreme degree that, quote in court, any reasonable person, excuse me, the risk of death would make itself apparent to any reasonable person. What we have here is more akin to someone driving, hitting a pedestrian or someone driving and intentionally veering toward a police car trying to stop him or maybe even more aptly toward a motorcycle because we're talking about a boat that was nearly twice the size of the Coast Guard's small boat and much more durable, much more heavy. The evidence that was recited by defense counsel for Mr. Mejia was by and large presented at trial and rejected by the jury. We have to presume that, for example, that it started off straight and veered right, the government's expert. And I think the video viewed fairly indicates that the left-hand turn was almost immediate contemporaneous with throttling up of the Ponga. We also presented evidence that the Ponga's throttle had to be essentially pushed to the maximum from the very beginning. The throttling up and the left turn toward the oncoming Coast Guard small boat together can hardly be understood other than by an attempt to drive at them. Now, again, this argument was brought up in the trial court that the defendant, if he wanted to get away, wouldn't have collided with the Coast Guard small boat. But again, government argued the opposite, that it could only be understood as an attempt to disable the small boat and get away. And the jury accepted that argument and rejected the defendant's argument. The defense argued about where the defendant was. Was he at the helm? Was he in full control? I think a fair viewing of the video with its infrared heat signature indicates that defendant Mejia was in full control at every relevant point up until that collision. And the collision may have knocked him, jostled him, as it certainly did with the people in the small boat. But when he is seen maybe being jostled away from the helm, certainly appears to be after the impact has occurred. You know, I should know the answer to this, but I do not. What was the steering design on the Ponga boat? Was the steering accomplished simply by operating the handle on the outboard motor, or was there a wheel? No. There's a helm with a steering wheel, just like you'd see in a car or an airplane or anything like that. Which means then that there are two separate things that have to be done if the Ponga is going to accelerate. There has to be pushing forward on the throttle, which is separate from the wheel, and then there has to be a turning of the wheel. As distinct from if you're just on the outboard, you can accomplish both things by twisting the handle and directing the handle. So in order to accelerate and to turn into the Zodiac, whoever did that had to be able to do two things more or less simultaneously with two different hands. That's correct. And not only that, but the steering wheel was turned to its maximum turning capacity to the left, which is two full rotations plus another half rotation to the left. So as we argued, it's hard to understand that except as an intentional or deliberate act. Can I ask you, Ms. Ames spent some time arguing on whether or not Mr. Beltran could be charged as an accessory after the fact when the offense had not ended. I think she was talking about the Taylor case. She didn't specifically mention Taylor. But I suppose Taylor could be read to suggest that a violent crime like murder or assault continues through the escape phase. I'd like just for you to comment or respond to that and see if you agree with the description that Mr. Beltran was still trying to escape from the authorities up until the time of his arrest. Well, he was trying to escape, but our argument is that the offense, the initial offense, which was the first failure to heave to the small boats commands and the murder of Chief Horn, were completed at that time. Now, Taylor, excuse me, Dinkane, introduced this idea of the escape phase of a crime. By the language of Dinkane, it seems to be reliant on the fact that the bank robbery has the taking element. And so that taking away of whatever property is obtained during the bank robbery is a part of the commission of the crime. It's just a different phase, the escape phase. Now, there has to be some temporal limit to an escape phase. And even if Taylor supports some argument that a violent crime could have an escape phase, that wasn't what was argued here, first of all. It wasn't brought up by either the defense or the prosecution. And secondly, I would submit that whatever temporal and proximal limits have to necessarily be implied, they were exceeded here. That collision ramming occurred about approximately 100 miles away and temporally about three hours away from the conduct that was presented at trial that Defendant Beltran committed that we relied upon to show that he was assisting Defendant Mejia in his escape. Much of that was the videotape recording. But all of his efforts to assist Defendant Mejia by manning those fuel hoses as is required, as necessary for the escape of the Ponga, occurred, was presented either by the testimony of the helicopter crew who were able to see him doing those things, the video, which the jury saw with their own eyes, or members of the Coast Guard response boat crew who arrived on scene. But again, that was about three hours after the offense occurred. So it's our claim that it would be a sort of difficult, perhaps absurd, reading of the statute to claim that the failure to heave to had continued throughout that escape phase when the boat that he's charged with failing to comply with the orders of had long ago left the scene. Had been disabled, and they were well on the way back to land to try to assist with the medical treatment of Chief Horn, and three hours later that offense is still ongoing. Moreover, Your Honor, I'd like to suggest that because this claim was never presented or briefed at trial, and it's just a sufficiency claim that's raised, Your Honor, the defendant is essentially saying that the government should have charged him with aiding and abetting because the offense was ongoing at the time of the second encounter. So what the defense's argument is that government charged the case wrong. We never objected to how it was charged, but had it been charged, the defendant, Beltran, been charged as an aid or an abetter, he would have received potentially, likely, much greater punishment. And certainly, he would have received a higher maximum sentence. And so, since we're looking at a waived sufficiency claim, and the termination is whether reversal requires a manifest injustice. On these facts, where the defendant got the benefit of the government's charging  the case. Counsel, I know it's a little off topic, but why aren't counts one and four multiplicitous? You know, you raised that, and I was thinking back. I was trial counsel. Yes. And, no, it wasn't raised in the trial court. But, and I'm trying to remember, because we did have quite a lot of deliberations on how to charge the case, as you could imagine. I'm fairly certain we looked into that. My belief is, without knowing the cases, is that we determined that they wouldn't be multiplicitous, that they would be separate. But I do not have the, I'm not sure about that. It seems more like a trial that should have been, I mean, at sentencing that should have been caught. Yes, and we covered it. I think, as you noted, but no, it wasn't raised. And you could address that if you, if the court so requests. This is a little off topic, too, but why were there no drug related charges, Bob? Well, that's an interesting question. And the, I think I could fairly say the answer was because the full quantity of the drugs were not recovered. 14 bales were recovered. And we were trying to determine at the indictment stage how accurately we could prove that they came from the defendant's ponga. Turns out, after some time, some research, and some labor, we were able to confidently claim that they came from the defendant's boat. But at that point, we were well into the litigation. It was a murder case in our view. And we chose to present that evidence as sort of integral motive evidence, rather than as a part of the drug trafficking conspiracy. So I guess that's the best I could do to answer that question. Mr. Beltran received many enhancements for the reasonable foreseeability of certain things based on the joint undertaking activity, including, I guess, the physical contact enhancement, which I think was three levels. Yes. I mean, is there anything that wouldn't be reasonably foreseeable? Taking out a gun and shooting someone, and so the death resulting enhancement for that. The point is, Defendant Beltran was present on that boat while Defendant Mejia rammed the Coast Guard. He continued with him along a 115 mile journey. When response boats and helicopters arrived to relieve the more distant aircraft that was pursuing them, that helicopter lit them up with a spotlight. The response boat activated law enforcement lights and issued commands over a loud hailer for them to stop. He didn't stop, he continued at 35, 40 miles per hour, about 35 knots. His resistance was not only emphatic and creating danger, but he had already demonstrated to anyone who was in the vicinity of that ramming that he was willing to go to extreme lengths to avoid getting caught, including by ramming the boat, which any reasonable person would understand would likely cause physical injury. Was it foreseeable that after three times the Coast Guard small boat, or excuse me, response boat was able to come alongside, issue orders with guns drawn, Defendant Mejia continued to resist. And during that time, we have to note, Defendant Beltran is continuing to assist even six minutes, about 11 miles, or maybe five, six miles, exact numbers, I don't remember. At least six minutes after the first Coast Guard boat pulls alongside, guns drawn, ordering them, Spanish and English, to stop. Defendant Beltran continues to manipulate the hoses. He takes something from Defendant Mejia. He's making holes in a fuel tank, trying to get air into it, so the fuel will flow. His assistance is continuing long after the point where Defendant Mejia's conduct shows that he's willing to go to great lengths to resist. And when the Coast Guard boat did make the sort of kinetic boarding, the unexpected boarding, they seized their opportunity. And Defendant Mejia hit the Coast Guard boarding officer's hand away. That was reasonable, too. That was reasonably foreseeable, too, the Defendant. Trial court found that. That's not an unreasonable finding based on the facts in this case. The results in death enhancement that Defendant Beltran challenges has no mens rea requirement. Defendant Beltran claims that that mens rea requirement has to be read into it for an accessory. We've explained why, in our briefing, we think that that's an illogical result. Because it doesn't make sense for the principal not to have to know that this results in death, and it doesn't make any more sense for the accessory to have to know, particularly in light of the type of situations in which a failure to give due cause in death would come up, which is a boat leaving the scene of the officers. Furthermore, I think the case law interpreting aggravating factors, and that's what this is, an aggravating factor, the clear statutory language designates it as that. The words are aggravating sensing factor. Do not impose any mens rea requirement. And in other cases where men have been charged as an accessory, where a sensing factor is found that the principal does not need to know or intend, or to have found that the sensing factor does not need to be known by the accessory. Perfect example of that is U.S. Justice Van Schoik, cited in the brief, where the defendant, the principal's distribution or possession with intent to distribute marijuana was made more serious by the quantity and type of drug that he intended to distribute. So we know that that type of quantity does not have to be known to the principal, and the court there held that it does not, indeed, have to be known by the accessory either. The point is, I think the overarching point in the thrust of all the cases cited, is that, like in U.S. versus D, the use of a, or possession of a firearm in furtherance of a violent crime, if that firearm is discharged, that does not require an intent on behalf of the principal. And the Supreme Court said that that is so because it is, you know, while it's unusual to impose criminal punishment for consequence of accidental conduct, that's not allowed. It is quite usual to impose criminal conduct for unintended consequences. U.S. versus Flores-Garcia, again cited in our brief, stated that an individual aiding and abetting a person who, the entry of a person who was excludable because he was a felon, did not need to know the person had that felon status. And the court said, provided the defendant recognizes he is doing something culpable, in other words, he is assisting the crime, he need not be aware of the particular circumstances that result in greater punishment. Your Honor, my time is running down. Are there any other questions? I'd be happy to answer. I think not. Thank you. Thank you. You've saved a little time. A little bit. And I guess I'd like to go back to the issue of the accessory after the fact offenses. Because when you looked at the totality of what happened in this case, and the government has pointed to Mr. Beltran, well, it's three hours afterwards that he's still manning these fuel lines and what have you. All of that is correct. However, what was also happening was this was a concerted effort by a number of members of the Coast Guard. So even though one boat after the collision had gone off to try to save Coast Guard Officer Horn, there were the planes, there was the other Coast Guard boat out there. They were working in conjunction with each other to all kind of try to locate, because they had the radar identifying the ponga, to continue to chase after it. And it took them some time before they were able to catch up to the ponga. So this was one continuing criminal offense. And that is why it's so important from appellant's position that the offense for accessory after the fact has the element that it has to be with the specific purpose or design to hinder or prevent the other person's apprehension. And in this case, there's no doubt, the evidence showed very clearly that Mr. Beltran was trying to escape. He was trying to get away from his own criminal conduct. However, there was no additional evidence to show that he was acting with the specific intent to assist Defendant Mejia-Leva. And regarding Mr. Mejia-Leva's very resist, excuse me, very resistive behavior. There was no indication in the beginning that he was going to behave that way. It was all when everything happened and he suddenly is ramming the Coast Guard boat that it continues to go in that direction. Mr. Beltran would have no ability to do anything about that. It was not reasonably foreseeable to him. He was not participating in the obstruction of justice in those respects, and thank you, Your Honor. Okay, thank both sides for their arguments. United States versus Beltran, Higuera and Mejia-Leva now submitted for decision. And that concludes our calendar for this afternoon.
judges: W. Fletcher, Murguia, Owens